will be submitted on the briefs. We'll begin with appeal number 22-3022, the United States v. Curtis. Ms. Carlson, good morning. Good morning. May it please the court, I am Kasey Carlson on behalf of the United States v. Curtis. I'm here to give you the minutes for reply. The evidence was insufficient to convict Mr. Curtis. No jury could have reasonably found that he knowingly conspired to transport stolen goods across state lines for count one or did in fact transport those goods across state lines for count two. The government's case against Mr. Curtis was plagued with significant gaps in the evidence. No witness identified Mr. Curtis as being present at the burglaries. No video or photographic evidence showed Mr. Curtis at the burglaries. No physical evidence such as stolen goods tied to Mr. Curtis, tied Mr. Curtis to the burglaries or to the transportation of stolen goods across state lines. Ms. Carlson, why couldn't the videos that were depicted of each of the burglaries that showed two individuals be sufficient for the jury to conclude that your client was one of those individuals in light of the items found in the car that had your client's DNA on them? Those items may have raised suspicion but as we argue in the briefs that suspicion did not rise to the level of certitude required to identify Mr. Curtis in those videos. In particular the items were a generic black glove. But the gloves weren't generic. They had certain insignia on them that you can see on the videos. Sure, the glove had a marking, I believe a word or something, a tag on it. However, gloves in winter in Wisconsin being found in someone's car with DNA. But specific gloves with DNA and the other items including similar clothing items, again why wouldn't that be sufficient to show him in the videos? Sure. Along with the size discrepancy. Mm-hmm. The other clothing items that were found in the car, a black sweatshirt, first of all had no DNA. Tennis shoes, tennis shoes matched. The tennis shoes as well, no DNA linking Mr. Curtis to them. And of course those are generally commonly used items and the DNA cannot put any time stamp on when Mr. Curtis placed that DNA. It could have been over the course of any innocent interaction with his friend, Mr. Carter. The surveillance video itself the government stressed at court showed a relatively large man and a relatively small man. Of course there are many, many people who could be a relatively large man in a video. What about the fact that the jury was able to assess your client's physique and his size and compare it to that on the video? The jury was certainly able to do that although I would argue that a person sitting down being for a couple days compared to video that was at times very grainy, very blurry, sometimes in the dark and you're seeking to identify that individual without any sort of face recognition or anything like that, that identification is going to be inherently limited and again it may raise suspicion but suspicion is just not the level of certitude that we require of our juries in order to convict beyond reasonable doubt of these crimes. Ms. Carlson, can you focus for a second on count two? That's the substantive 2314 count. That statute as you know requires proof of the monetary value of the goods transported across state lines, the $5,000 figure. What did the trial evidence show was stolen from the Xfinity store in Woodbury? Is it Woodbury, Minnesota? Yes, it's Woodbury, Minnesota and it was a I can't recall. Fair enough, so iPhones and what-have-you. Is there any question that those stolen goods in the trial evidence that they if you added up their value cost or retail value that they would exceed $5,000? No, there was not based on the testimony from an individual who does inventory for the store. The store knows what was taken? Exactly. Okay, and so the difficulty that Mr. Curtis presents to you is there were cell phone cell site tower records right showing Mr. Curtis's phone pinging off a tower in or around Woodbury near the time of that robbery about 3 o'clock in the morning, correct? There was correct in the sense that there was a cell phone pinging off of towers near Woodbury. We challenged whether or not that cell phone. Was this the iPhone 11 found in the Tahoe that links to his email address? That is the phone that pinged near Woodbury. Okay, so there's a phone that's pinging. Okay, but then moments later after the robbery was completed of the Xfinity store, that phone was pinging off towers in Wisconsin and Woodbury is a border town, right? Woodbury is a border town. So why couldn't a juror, why couldn't a reasonable jury infer that given the pain in Wisconsin moments later that what they did is they robbed the Xfinity store, they jumped in the Tahoe, they drove across state lines and the phones pinging across state lines? There's a couple holes in the evidence to support that inference. None of those stolen goods were ever identified as having crossed state lines or for Wisconsin and no, none of those goods of course were found with Mr. Curtis and we challenged the ability of a reasonable jury to identify Mr. Curtis. Mr. Curtis though himself was apprehended in Wisconsin along with Carter, right? No, Mr. Curtis was not apprehended in Wisconsin. Where did he get arrested? I believe it was Ohio but it was months later. And the Wisconsin burglary which is course relevant for count two, that is actually not the burglary that ended in the result, the arrest of Mr. Carter, the alleged co-conspirator. That's a separate burglary. So those stolen goods were never identified and the identification of Mr. Curtis to those stolen goods. But that Xfinity robbery is the is the focus of the count to charge, correct? Absolutely and really the evidence on the interstate travel is as you describe, a phone that was pinging and that's, that is it. What about the duffel bag that was found with the stolen goods? I think on Wisconsin side. The duffel bag that was found with the stolen goods relates to a burglary and I believe it's Wauwatosa, Wisconsin, not the Minnesota burglary. So those goods were burglarized presumably by Mr. Carter and then found in Wisconsin. So Wisconsin to Wisconsin, no interstate travel. You want to save some time? I do. Okay, very well. You're welcome. Ms. Borra, good morning. Good morning. May it please the court, Anita Borra on behalf of the United States. The jury in this case heard from 29 witnesses. It might be best to start with count two and the evidence that we have to support the $5,000. Kind of where we ended and so build from there. Absolutely. The Xfinity store manager from the Woodbury Xfinity store testified that the total loss amount was in excess of $40,000. The inventory was submitted as exhibit 89. I'll spend some time picking through the evidence that established the interstate nexus for count two. I want to emphasize that the evidence which for count two really rests on the telephone cell tower tracking data needs to be analyzed in the context of this entire case. So when we look at the two counts, the conspiracy count in count one and then the transportation of stolen goods count in count two, we need to look at the evidence holistically. Holistically, we know that Mr Carter's phone and Mr Curtis's phone were traveling across the Midwest, crisscrossing from state to state. Um, I believe they touched in six states in less than a month, and those two phones were pinging off of cell towers in the locations of the eight burglaries at the very exact time that those burglaries occurred. So it is reasonable for the jury to conclude that these two burglars, Mr Curtis being one of them, had an established M. O. Where they were traveling into states to burglarize stores and then immediately exiting the vicinity of those stores and taking the goods across state lines. And this just wasn't a one off. It happened again and again. We saw them traveling through their phones from Madison, Wisconsin to the Iowa area. They burglarized stores in the Iowa area and then immediately started traversing across the state through Illinois, through Indiana, ultimately to Ohio, where they again burglarized a store in Ohio, eventually traveling back to Madison, Wisconsin, which appeared to be their base of operations. Now that all relates to count one that relates to the conspiracy count. And there are other pieces of evidence that add credence to this notion that this was a pattern of activity. We know, for instance, that goods that were consistent with those that were stolen in the Iowa burglaries, that Mr Carter's phone took pictures of those items or items consistent with them when the phone was in Madison. So the goods were stolen in Iowa, traveled to Madison, where pictures were taken of them. We also know that a watch that was consistent with a watch, a Movado watch that was consistent with that watch was recovered from the Chevy Tahoe on the night of Mr. Carter's arrest shortly after the Wauwatosa burglary. So all of this combines to paint a picture. A picture, a pattern of burglaries, and then immediate, near-immediate departure from the sites of the burglaries to travel across state lines. I highlight these pieces to show that this creates context for what happened in the Woodbury burglary. The Woodbury burglary forms the basis of the transportation of stolen goods count and count to. And we know that there was just a tight timeline that was established from Mr. Curtis's phone and Mr. Carter's phone. Those two phones were traveling together and the cell tower data established that. 3.07 a.m., the two phones start hanging off of cell towers in the vicinity of the Xfinity store. By 3.14, the phones have left, and that is consistent with the video of the burglary itself. We see that there's a time-stamped video consistent with the cell tower data. And then by 3.28, the phone starts hitting near towers on the found at Exhibit 109. Exhibit 109 is a compilation presentation that was put together by the FBI analyst that crunched the data from the cell phone towers. Were the goods ever recovered? Not from the Xfinity burglary, no. Did the investigation retrace the route? I don't know. As best as best you would know the Judge St. Eve, I think you picked up on an interesting data point. The CCM bag that is visible in the video footage from the Xfinity burglary, that bag is consistent with the one that was recovered on the night of Mr. Carter's arrest in West Allis, Wisconsin. Um, that CCM bag was the bag that was, um, near a detached garage in the flight path of the second person who fled from the Chevy Tahoe. So it's, um, Christmas Eve, December 24th, 2019. We see from a ring video that the Chevy Tahoe was traveling down a road in West Allis. It encountered a police car. Shortly before that, we know that a person exited the car, um, and, and fled. Um, in that flight path, the CCM bag, one that looks exactly identical to the one that featured in the Xfinity burglary in that CCM bag was recovered in the flight path of the person in West Allis. Um, again, bolstering this notion that they didn't have time to dump the goods. They didn't stow the goods. That wasn't their M.O. Their M.O. was to take the goods and then flee the scene. Um, and many cases crossing state lines when they did it. Well, they did something with the goods, right? Because they weren't recovered. True. The Xfinity folks said we lost $40,000 of phones and other items. And then not, not too long thereafter, at least Carter's arrested, right? The Xfinity burglary was December 17. Mr. Carter was arrested December 24th. Okay, I got it. And yes, certainly something did happen with the stolen goods. We did not understand their ultimate destination, but certainly I think the record is sufficient to say that it was reasonable for the jury to conclude that goods that were stolen from Xfinity made their way into Wisconsin within a 10 minute window of the burglary itself. I don't think there's any question that there were in fact stolen goods. Um, briefly in my final minutes, I'd like to spend some time talking about the iPhone 11 and why it was reasonable for the jury to conclude that that iPhone was in fact Mr. Curtis's. There's really two parts to this. The first part is the location data itself, wherever Mr. Curtis was in November and December of 2019 confirmed sightings, so to speak. That is where the phone was too. So for instance, we have the Roscoe, Illinois encounter that happened on December 19. When officers encountered Mr. Curtis in that iPhone 11 that was recovered from the getaway car, the Chevy Tahoe. Is that when they were sitting outside with their lights off and license plate covered? Correct. Likewise, when Mr. Curtis was in the Walgreens on Brady Street in Milwaukee, Wisconsin on December 24th, the same night of the Wauwatosa burglary, we know he was in Walgreens because we have video footage from transacting. He's buying something at the Walgreens store and his cell phone is pinging off of cell phone towers near that Walgreens stores. So when we have confirmed sightings of him, his cell phone is pinging off cell phone towers. Now that's true for his travel as well. We subpoenaed records from airlines. We know that Amicia Day Curtis traveled to California. He traveled to Texas. He traveled to Georgia at relevant time to the indictment. When he was traveling, the cell phone was tracking directly with him. And I want to highlight some testimony because I think the briefing suggests that, well, perhaps there was another person on these flights. But that simply is not the case. Special Agent Mary Davidson of the United States was no other person that overlapped on each and every one of these flights. That is in the trial record at 145, record 145 at pages 99 and 100. So it is his phone. He used it. He controlled it. Wherever he was, the phone was too. The phone linked to an email address as well, right? Correct. It linked to an Apple ID account which used Cartier Glass 608 at gmail.com. He used and controlled that email address to set up the flights and also other travel arrangements. Details about the Apple ID account, what the jury heard about what that the significance of that is at record 140 at page 100. Thank you. You're welcome. Thanks to you, Ms. Boer. And Ms. Carlson, you've got some time left on rebuttal. Right. So just a few points that I'd like to address. The first, the government in its briefing and here in oral argument as well, stresses the need to look at the evidence holistically, which of course is true, but each inference that is stacked in the inferential chain must be analyzed individually and confirmed for reasonableness for the holistic evidence to pile up to mean anything at all. Without those individual inferences, the larger case collapses. So I'd like to touch on a couple of the limitations of the iPhone 11 and of the phone evidence, which of course is highly relevant for count two for the interstate travel, but it's also important for count one as well. So first, it was not registered. The iPhone 11 was not registered in Mr. Curtis's name. It was not named as him. The email address in question that was said to be connected to it was named Cartier. And of course, the alleged co-conspirator here is Mr. Carter. The phone was found in Mr. Carter's car. And although the government points to confirmed sightings where the phone pinged where Mr. Curtis was confirmed to be, of course, Mr. Carter was in both of those confirmed sightings with the police officers and in the Walgreens. He wasn't traveling with him to California and the other locations, was he? Mr. Carter was, no evidence was presented that Mr. Carter was on those flights. Of course, even if you could infer presence from a phone, presence alone is not enough for either of these counts. The Jones case that is discussed in the briefing discusses the limitations of presence and the care that is brought to the judicial system to make sure association with criminals does not lead to a conviction. And with that, I think I have nothing further. Because the evidence was insufficient, we would ask the court to vacate the convictions on both counts. Thank you, Ms. Carlson. Ms. Bohr, thanks to you. Ms. Carlson, I see your appreciate the advocacy you've advanced in your firm. Mr. Brody, it's always nice to see you on behalf of Mr. Curtis and we'll take the case under advisement.